## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Crim. No. 06-334 (ESH)** |
| **HAJI BAGCHO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing to the Court for its consideration.

I)    <u>Introduction</u>

On January 28, 2010, a grand jury in the District of Columbia returned a four count superseding indictment against the defendant and two others.  Count one charged the defendant with conspiracy, between 2005 and the date of the indictment return, to distribute one kilogram or more of heroin knowing and intending that it would be unlawfully imported into the United States.  Count two charged the defendant with distribution, on September 25, 2006, of one kilogram or more of heroin, knowing and intending that it would be unlawfully imported into the United States.  Count three charged the defendant with distribution, on May 21, 2008, of one kilogram or more of heroin, knowing and intending that it would be unlawfully imported into the United States.  Count four charged the defendant, between 2007 and the date of the indictment return, with engaging in a drug trafficking offense, knowing and intending to provide something of pecuniary value to a person or individual who has engaged or is engaging in terrorist activity or terrorism.  On March 12, 2012, a jury convicted the defendant of counts one, two and four after a three week trial.

1

The evidence adduced at trial reflected that over more than a decade, the defendant presided over a large-scale heroin production and trafficking network based in eastern Afghanistan.  Operating on both sides of the Afghan-Pakistani border, the defendant directed hundreds of people in the conversion of opium into high quality heroin, which was then distributed by a variety of means to numerous countries throughout the world.  In later years, after coalition forces had ejected the Taliban regime and put pressure on his organization, the defendant used some of the large quantity of heroin proceeds he generated to fund and supply powerful Taliban commanders in their quest to expel the "infidels" and overthrow the current government, thus allowing the defendant to "deal freely."  At trial, the government introduced ledgers belonging to the defendant, reflecting that in 2006 alone he was responsible for the production and sale of over 123,000 kilograms of heroin, with a wholesale value of more than $261,000,000, amounting to more than 19% of the world's supply of heroin.  It can be fairly said that the defendant is perhaps the largest drug trafficker by volume, and certainly the largest drug trafficker by share of global production, ever brought to justice in the United States.

For all the reasons set forth herein, the Government requests that this Court sentence the defendant to terms of **life imprisonment**.  Such a sentence is within the statutory maximum provided by law for these offenses and is also consistent with the defendant's "advisory" total offense level under the Federal Sentencing Guidelines. See United States v. Booker, 543 U.S. 220 (2005).

Moreover, pursuant to 18 U.S.C. Section 3553(a), this Court is authorized to fashion a sentence which reflects, inter alia, "the nature and circumstances of the offense," as well as consideration of other listed factors.  In this case, a sentence of life imprisonment is an appropriate punishment for the defendant's conduct.  This trial was only the second ever under

the narco-terrorism statute.   A sentence of this magnitude is necessary to deter future criminal conduct by others, ranging from the defendant's co-defendant son, still located in Afghanistan, to the Taliban, who support and benefit from international drug trafficking, to those in other unstable regions who would use drug proceeds to fund campaigns of violence, by sending a clear and unequivocal message that their illegal conduct will be severely punished in U.S. courts. Further, such a sentence would ensure that the defendant will not be able to harm others in the future.

II)     The Evidence at Trial Overwhelmingly Established the Defendant's Involvement in Drug Trafficking With Knowledge and Intent to Send Heroin to the United States, and  Narco-Terrorism.

The defendant's arrest and ultimate conviction was the product of a lengthy investigation conducted by the U.S. Drug Enforcement Administration (DEA), in partnership with Afghan law enforcement authorities, between late 2004 and 2010.   The "offense conduct" outlined in paragraphs 10-37 of the Pre-Sentence Report thoroughly sets out the facts that were adduced at trial.   Suffice it to say, there was a wide variety of evidence linking the defendant to the drug trade and to narco-terrorism, consisting of eyewitness testimony, documentary evidence, physical evidence and audio recordings of meetings and telephone calls with the defendant and co-conspirators.   In addition to the historical evidence, the proactive investigation resulted in the purchase of approximately 6 kilograms of 85% pure heroin, worth $10,000,000 were it diluted and sold on the streets of the United States.   As elicited at trial, the essential facts of the case were as follows:

In late 2004 - early 2005, the U.S. Drug Enforcement Administration (DEA) and Afghan authorities began their investigation of the defendant and his organization, based in Nangarhar Province, located in eastern Afghanistan between Kabul and the Pakistani border.

In late 2005 and into 2006, Commander Shaheen of the Afghan border police assisted the DEA by acting as a corrupt police official and having a series of conversations with the defendant. In the course of trying to corrupt Shaheen into providing investigative information and protection for his drug loads, the defendant recounted some of his drug trafficking activities, including a trip he took with his chemist to Japan in 2005, to repair a load of heroin which had become discolored due to poor packaging. Records obtained from Japanese authorities reflect that the defendant traveled to Japan on July 11, 2005 with Farman Shah, a prominent figure in the trial and well known heroin chemist.

On April 20, 2006, DEA Special Agent Greg Brittain accompanied an Afghan police unit and their British mentors on a search of the defendant's compound. There, they found several empty 2 1/2 liter bottles, kilogram-sized cloth bags, and several ink stamps and ink pads, which Agent Brittain explained were paraphernalia consistent with heroin manufacturing and distribution.

In September 2006, the DEA enlisted the help of a confidential source named Farid, whose knowledge of the defendant dated to before 2000. During the Taliban regime in the late 1990s up to 2002, Farid worked in his father's opium shop, where the defendant visited regularly to purchase opium, which the defendant explained was for conversion into heroin to satisfy orders he had received. Three ledgers that Farid produced reflected that in an 18 month period ending in October 2001, the defendant made approximately 101 transactions amounting to 2,568 kg. of opium, valued at more than $300,000. In addition to purchases from their shop, Farid testified that he observed the defendant frequent many of the other opium brokers in the bazaar, where he made numerous additional purchases.

4

Between September 19-25, 2006, Farid and the defendant had several recorded conversations, during which they negotiated for the delivery by the defendant of two kilograms of heroin to Farid.  The defendant was told that a friend of Farid's was sending the heroin to "America," as well as other countries.  After depositing $5,000 with Zahir Shah, a "saraf," or money exchanger, Farid took delivery of the heroin (later found to be 85% pure) at the defendant's compound.

In the fall of 2007, Afghan authorities recruited a confidential informant named Qari, and he began providing information about the defendant and his organization.  He originally worked with the defendant's son, Sucha Gul, in Pakistan as an assistant, and would help Sucha count the large amounts of money in various currencies (including U.S. dollars) that drug couriers would bring from around the world on a daily basis.  Later, Qari worked as the defendant's assistant, and was a constant presence as the defendant met with various traffickers, arranged deals and took orders for heroin to be made.  Qari witnessed all aspects of the defendant's organization, which Qari estimated employed more than 250 people.

Qari explained how he learned the heroin trade at the defendant's direction:  he worked in and traveled with the defendant to various heroin conversion laboratories that the defendant operated; he observed the participation of essential participants in the organization – Farman Shah, the defendant's main chemist, Haji Bando, the defendant's brother and manager in the labs, and Sucha Gul, who handled the record-keeping and money;  he helped package heroin, and assisted the defendant in loading packages of heroin into various vehicles;  he transported the defendant's heroin, often armed with an AK-47 machine gun provided by Haji Bando, and in the company of Sucha Gul, who would take care of any law enforcement problems they encountered.

5

Qari testified to the following specific transactions he personally witnessed the defendant participate in:  a late 2005 deal with Haji Bakhti and Haji Ghairat, involving the production and shipment of 250 kilograms of extra pure heroin to New York – "the heart of the United States"; an early-mid 2006, shipment of 3 kilograms of heroin to the United States, transported by three women whom the defendant oversaw swallow the heroin prior to departure; another early-mid 2006 sale of 1,000 kilograms of heroin to Haji Wazyat and Haji Dilawar, two heroin traffickers from Kandahar Province, Afghanistan.

In his conversation with Afghan police, Qari also described the manner in which the defendant kept track of his various transactions using ledgers, which were updated frequently by Sucha Gul at the defendant's direction.  Based on information he provided, police conducted a search of Farman Shah's compound on November 17, 2007, where they recovered two ledger books in a plastic bag concealed in the pit under a latrine.  Special Agent Dave Keiken, testifying as an expert, examined the ledger books.  One book, covering a year from 2006-2007, contained a series of money transactions with sirafs, as well as multiple transactions of opium and various precursor chemicals and supplies involved in the production of heroin.  The second book contained a series of heroin transactions, arranged by trafficker, between March 2006 and March 2007.  An analysis of that ledger determined that the defendant produced and sold over 123,000 kilograms of heroin, worth more than $261,000,000.  This represented more than 19% of the total amount of heroin produced worldwide in 2006, based on figures produced by the United Nations Office of Drugs and Crime.

In April 2008, Afghan police conducted an operation to purchase heroin from the defendant that was intended for delivery to the United States through a Japanese customer.  In a recorded meeting with Qari and another confidential source, the defendant agreed to help the

men, referring them to a lieutenant of his named Shahed Gul to handle the specific negotiations. Over several days in May 2008, there was a series of recorded conversations with Shahed Gul in which the heroin transaction was discussed.  At one point, Shahed Gul acknowledged that "whatever Haji Bagcho says we do it because we are his servants. Call us servants, clerks or whatever but we are his own people. When he tells us to do something, we do it."  Shahed Gul also reassured the buyers about the quality of the heroin, telling him that "I agree with this, what you say is right, this is the goods of Haji Bagcho, the goods of our own man."  The negotiations culminated in the purchase of approximately 4 kilograms of 84% pure heroin on May 21, 2008.

Subsequent to this heroin purchase, an undercover Afghan police officer had a series of recorded phone calls with the defendant, with the goal of meeting him in a third country.  During their calls, the defendant acknowledged his involvement in the May 2008 heroin sale, highlighting the quality of the heroin.  They discussed the prospect of future transactions of as many as 100 kilograms of heroin destined for the United States, before the officer's cover was blown when the defendant learned that Qari was working with the authorities.

Through their interviews with Qari, the DEA and Afghan police confirmed that the defendant had extensive relationships with the Taliban.  The defendant relied upon particular Taliban commanders to provide his operation with protection from Western and Afghan military forces and police.  These commanders included Khona, Maftoon, and Mauwali Kabir, a former heroin trafficking partner and governor of Nangarhar Province under the Taliban regime.  The defendant would provide monetary and other assistance to these men and their surrogates, either directly or through his son at his direction.  During the period following a October 2006 search warrant on the defendant's compound, examples of this support included: 55,000 Pakistani rupees paid to Maftoon; AK-47 machine guns, rocket propelled grenade launchers and related

ammunition provided to Khona, along with foodstuffs and more than 100,000 Pakistani rupees in cash; and more than 20 million Pakistani rupees paid to Maulawi Kabir, equal to approximately $333,000.

The defendant's reasons for supporting the Taliban were made clear through various comments that he and his son made, that the recipients of their aid "were commanders of jihad," and "were fighting to get the Americans out of Afghanistan."  The defendant encouraged other traffickers to support the Taliban as well, telling them that "we should all help the commanders to work to get the Americans out of the country, and giving money to the Taliban is jihad in itself."  In another instance, he told others that they should support the Taliban to get the Americans out of Afghanistan so we can all deal freely."  The defendant also encouraged farmers to "grow opium so we can make heroin to kill the infidels," by which he meant Americans and other Westerners.

Qari's recounting of the defendant's association with the Taliban was corroborated.  In particular, in January 23, 2009, Qari and Bagcho had a recorded conversation, during which the defendant discussed a disagreement with Maftoon, whom the defendant had sold 10 kilograms of heroin.

On May 14, 2009, the defendant was arrested after he was expelled from Pakistan. During his transportation back to Kabul, the defendant told one of the Afghan officers that if he wasn't caught with anything in his hands, he couldn't be arrested, and that he shouldn't be arrested for things he'd done in the past.

III)     Legal Analysis

A.        The Defendant's Advisory Federal Sentencing Guidelines Range Is Life Imprisonment

        In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that certain

applications of the mandatory United States Sentencing Guidelines violated the Sixth

Amendment, because they permitted the maximum allowable sentence to be enhanced based on

judge-determined facts.  As a remedy, the Court invalidated the statutory provision that made the

Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus making the Guidelines "effectively

advisory." Booker, 543 U.S. at 245.  Nonetheless, the Supreme Court held that in the future a

district court must still "consult [the] Guidelines and take them into account when sentencing."

Id. at 264 (citing 18 U.S.C. §§ 3553(a)(4) & (5)).   "Under this new sentencing regime, a

sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is

permitted 'to tailor the sentence in light of other statutory concerns as well.'" United States v.

Coumaris, 399 F.3d 343, 351 (D.C. Cir. 2005) (internal quotations omitted). The "other statutory

concerns" referred to in Coumaris are expressed primarily in 18 U.S.C. § 3553(a).  United States

v. McCants, 2006 WL 3086883 at p.4 (D.D.C.).

        The decisions issued since the Booker ruling have set out a procedure for the imposition

of sentences with where Guidelines are merely advisory.  Under these rulings, a sentencing court

must first correctly determine the applicable Guidelines sentence, including any permissible

departures, and then, after considering the Guidelines and all other factors in Section 3553(a),

decide whether to apply the Guidelines sentence, or apply a non-Guidelines sentence.  See

United States v. Eura, 440 F.3d 625, 632 (4th Cir. 2005); United States v. Crosby, 397 F.3d 103, 111-13 (2d Cir. 2005).[1]

As reflected in the Pre-Sentence Report (PSR), the defendant's Guideline range on count four (the count producing the highest offense level) is calculated using a combination of §2D1.14(a) for the base offense level (calculated using the offense level under §2D1 for the underlying offense) and §3A1.4 for the specific offense characteristic.

In this case, the base offense level is **40**, corresponding to involvement with more than 30 kilograms of heroin as well as possession of a dangerous weapon during the offense.

With respect to the specific offense characteristic, §3A1.4 applies, as narco-terrorism falls within the definition of a federal crime of terrorism, and the defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   See 18 U.S.C. § 2332b(g)(5).  As such, the base offense is increased by **12** levels.  Additionally, §3A1.4(b) dictates that the defendant's criminal history level shall be set at  Category **VI**.

Further, the defendant receives a **4** level increase pursuant to §3B1.1(a) for being an organizer or leader of a criminal activity involving five or more participants or that was otherwise extensive.

Based upon the government's calculations (and consistent with the PSR), the defendant's total offense level is **56**, though adjusted to a level **43** pursuant to USSG, Chapter 5, Part A,

---

[1] If a district court decides not to apply a Guidelines sentence, it must explain on the record its rationale for varying from the advisory sentence. See United States v. Mares, 402 F.3d 511, 519 (5th Cir.); Crosby, 397 F.3d at 116. The final sentence will then be subject to review by the Court of Appeals for "reasonableness." Booker, 543 U.S. at 261-262.

Application Note 2.[2]   When calculated with a criminal history Category VI, the resulting guidelines are life imprisonment.[3]

B.      The Factors Set Forth In 18 U.S.C. Section 3553(a) Support of A Sentence of Life Imprisonment.

As the jury found that the amount of heroin distributed by the defendant was one kilogram or more, the defendant's conviction on count four carries with it a mandatory minimum sentence of twenty years incarceration and a maximum sentence of life. See 21 U.S.C. § 960a(a) (". . . shall be sentenced to a term of not less than twice the minimum punishment under section 841(b)(1) of this title [10 years], and not more than life. . . ).   However, the factors set forth in 18 U.S.C. § 3553(a) support the conclusion that a sentence of life imprisonment is appropriate under the facts and circumstances of this case. The relevant factors include:

1.      The Serious Nature and Circumstances of This Offense

The defendant is the largest drug trafficker by share of global production that has ever been prosecuted in the United States, and is certainly the largest drug trafficker that this Court will ever sentence.   More than a decade ago, the evidence at trial showed that the defendant was already a significant heroin producer, purchasing tons of opium annually at the Ghani Khel bazaar to convert into heroin.   It should come as no surprise then that by 2006, the defendant played an outsized role on the world stage. By his own account, the defendant was responsible

---

[2] It should be noted that the guidelines were calculated using the 2009 version of the manual.  Under the 2011 version in effect today, the defendant would have been subjected to additional increases of 2 levels pursuant to § 2D1(b)(11) for attempting to bribe law enforcement officers to facilitate commission of the offense, 2 levels pursuant to § 2D1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance, and 2 levels pursuant to § 2D1(b)(14)(D) or (E) for having an aggravating role under § 3B1.1 and engaging in witness intimidation and committing the offense as part of a pattern of criminal conduct engaged in as a livelihood, bringing his base offense level to 46, with a resulting total offense level of 62.

[3] The same guidelines range would have resulted even without a conviction on count four and the specific offense characteristics that come with it.  On the conspiracy charged in count one alone, the defendant would still have been subjected to a base offense level of 40 and a role adjustment of 4, for a total offense level of 44.

for trafficking more than 123,000 kilograms of heroin in the *12 month period* ending in March 2007, amounting to more than 19% of the heroin produced globally that year.[4]   Further, aside from the quantity of heroin this man produced, the Court heard testimony and recorded evidence at trial concerning the importance to the defendant of his reputation for producing particularly high quality heroin.   This is born out by the heroin purchased from him in this case, averaging 85% purity, which according to Dr. Thompson was at the upper end of the spectrum of heroin that he's examined.[5]   In short, the impact that this man and his organization had on the world heroin market cannot be overstated.

The extreme violence and insecurity that pervades life in Afghanistan is hard to understate.   In 2009, the last year the defendant operated there, total coalition deaths totaled 521 men and women.[6] American casualties alone amounted to 311 dead and 2,145 wounded.[7]   The toll on the civilian population was even more severe, with casualties amounting to 5,978 killed and wounded.[8]   The Court will recall witness' descriptions of the types of violence perpetrated

---

[4] While unnecessary given that he is already at the top of the guidelines scale, the sentencing guidelines contemplate an upward departure in "extraordinary" cases such as this one.  See U.S.S.G §2D1.1, Application Note 16 ("In an extraordinary case, an upward departure above offense level 38 on the basis of drug quantity may be warranted.  For example, an upward departure may be warranted where the quantity is at least ten times the minimum quantity required for level 38.  Similarly, in the case of a controlled substance for which the maximum offense level is less than level 38, an upward departure may be warranted if the drug quantity substantially exceeds the quantity for the highest offense level established for that particular controlled substance.")

[5] Significant purity is another factor that the sentencing guidelines suggest warrant a higher sentence.  See U.S.S.G §2D1.1, Application Note 9 ("Trafficking in controlled substances, compounds, or mixtures of unusually high purity may warrant an upward departure . . . The purity of the controlled substance, particularly in the case of heroin, may be relevant in the sentencing process because it is probative of the defendant's role or position in the chain of distribution.  Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs. . ." It is worth noting that the remaining 15% of the substances in this case did not consist of adulterants, but rather unconverted opiate alkaloids.

[6] iCasualties.org, available at http://icasualties.org/oef.

[7] U.S. Department of Defense, Defense Manpower Data Center, Data, Analysis and Programs Division, available at http://siadapp.dmdc.osd.mil/personnel/CASUALTY/oefmonth.pdf.

[8] UNITED NATIONS ASSISTANCE MISSION TO AFGHANISTAN, HUMAN RIGHTS UNIT, *Afghanistan: Annual Report on Protection of Civilians in Armed Conflict, 2009*, January 2010, p. 1,

by the Taliban, whom the defendant was supporting, including the planting of bombs to blow up vehicles, shooting bullets and rockets at Western troops, attacking convoys and embassies, as well as throwing acid on girls who attended school.  Further undermining the country, and posing a global threat, is Afghanistan's unquestioned position as the single greatest producer of opium and heroin in the world, with 82% of global land under poppy cultivation[9] and 92% of overall opium produced as determined by the United Nations in 2008.[10]

Measured against this backdrop, it is clear that the defendant's illegal activities as a drug trafficker and supporter of terrorists constituted an extremely serious form of criminal conduct, particularly when, as in this case, the two activities were combined.  The evidence established that the defendant's activities were not isolated events.  Rather, they were indicative of his dedicated involvement in perpetuating the turmoil that has prevented the people of Afghanistan from living in peaceful coexistence under a stable government.  Further, his conduct directly threatened the lives of American service members, their NATO coalition partners, and the Afghan public.

This Court is authorized by statute to impose a sentence necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. §3553(a)(2)(A).  The illegal conduct committed by the defendant supports the sentence sought by the government.

---

http://unama.unmissions.org/Portals/UNAMA/
    human%20rights/Protection%20of%20Civilian%202009%20report%20English.pdf.
[9] UNITED NATIONS OFFICE ON DRUGS AND CRIME, *2008 World Drug Report* at 37, available at http://www.unodc.org/documents/wdr/WDR_2008/WDR_2008_eng_web.pdf.
    [10] Id. at 40.

2.      The Need For Deterrence

The federal sentencing statute also provides that the punishment should afford "adequate deterrence" of criminal conduct.   18 U.S.C. §3553(a)(2)(B).   Three factors are relevant in discussing deterrence here.   First, this is only the second trial in the nation under the narco-terrorism statute, and it has received a fair amount of press attention.

Second is Afghanistan's prominence in the production of opium and heroin.   As evident from an examination of the transcripts introduced at trial, drug production and trafficking are so commonplace that they are discussed and conducted in barely disguised terms, despite the fact that traffickers are aware that their conversations may be monitored by police.   Further, respect for law enforcement is such that it is seen at best as an inconvenience – something to be corrupted into acquiescence rather than a reason to cease criminal activity.

The third factor concerns the central role of the Taliban in opium/heroin production and transportation, relying on it as a principal source of funding for its activities.   As noted by the United Nations, "opium cultivation in Afghanistan is now closely linked to insurgency."   United Nations Office of Drugs and Crime, *Afghanistan Opium Survey 2007* (October 2007) at iii.[11] Reviewing the historical relationship between the Taliban and opium, the UNODC concluded that:

> . . . the Taliban are again using opium to suit their interests. Between 1996 and 2000, in Taliban controlled areas 15,000 tons of opium were produced and exported – the regime's sole source of foreign exchange at that time. In July 2000, the Taliban leader, Mullah Omar, argued that opium was against Islam and banned its cultivation (but not its export). In recent months, the Taliban have reversed their position once again and started to extract from the drug economy resources for arms, logistics and militia pay.

---

[11]Available at http://www.unodc.org/pdf/research/Afghanistan_Opium_Survey_2007.pdf.

Id. at iv.

Given all of these factors, the sentencing of this defendant presents the Court with the opportunity to send a clear message to the Taliban and other drug traffickers in Afghanistan, as well as narco-terrorists world-wide: the punishment for sending drugs to the United States from abroad, and using the proceeds from drug trafficking to finance terrorist activity, is significant.

3.      Protection of the Public from Further Crimes of the Defendant.

It is plain from the evidence introduced at trial that the defendant is intent on producing as much heroin as possible, to make money, certainly, but also to harm Americans directly through their consumption of the drug, and indirectly by supporting the Taliban in their efforts to harm Americans and others who stand in their way.  During the trial, the Court heard evidence of the defendant's thoughts, whether inspiring farmers to grow opium "so we can make heroin to kill the infidels," or exhorting fellow traffickers to join him in supporting the Taliban to "help the commanders to work to get the Americans out of the country, [that] giving money to the Taliban is jihad in itself."  There is no indication that the defendant has softened his views since he was arrested.  Thus, even if the defendant were to express contrition for his conduct at this point (something he has never done previously), it would be impossible to determine the sincerity of his words.

Given the defendant's single-minded focus on nurturing his drug manufacturing and trafficking business, to permit him out of prison to return to Afghanistan would be to subject all those who support a free and democratic Afghanistan -- westerners and Afghans alike -- to substantial danger.

15

IV)    Conclusion

The defendant was a substantial drug trafficker whose product has harmed countless lives abroad, and whose support of the Taliban has harmed untold lives within Afghanistan.  An equally substantial sentence is necessary to protect the public from him, and to send a message to others who would seek to traffic drugs and support terrorism.  Therefore, it is respectfully requested that the Court sentence the defendant to life imprisonment.

Respectfully submitted,

Arthur Wyatt, Chief
Narcotic and Dangerous Drug Section


_____/s/ Matthew Stiglitz_____
Matthew Stiglitz
Deputy Chief
Human Rights and Special Prosecutions Section
U.S. Department of Justice, Criminal Division
1301 New York Ave., NW, 2[th] Floor
Washington, D.C.  20530
202-305-3646
matthew.stiglitz@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was filed this 4th day of June, 2012 via ECF, which will electronically deliver copies to Shawn Moore, Esq. and Michelle Peterson, Esq., counsel for the defendant.

_____/s/ Matthew Stiglitz _____
Matthew Stiglitz

16