UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | |
| | . | |
| Plaintiff, | . | CR No. 06-334 |
| | . | |
| v. | . | |
| | . | |
| HAJI BAGCHO, | . | Washington, D.C. |
| | . | Friday, January 20, 2012 |
| Defendant. | . | 10:32 a.m. |
| | . | |

. . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        MATTHEW R. STIGLITZ, ESQ.
                          MARLON COBAR, ESQ.
                          U.S. Department of Justice,
                          Criminal Division
                          1301 New York Ave. NW, 2nd Floor
                          Washington, DC 20530
                          (202) 305-3646

For the Defendant:        SHAWN F. MOORE, AFPD
                          MICHELLE PETERSON, AFPD
                          Federal Public Defender Office
                          625 Indiana Avenue, NW
                          Suite 550
                          Washington, DC 20004
                          (202) 208-7500

Court Reporter:           BRYAN A. WAYNE, RPR, CRR
                          Official Court Reporter
                          U.S. Courthouse, Room 4704-A
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3186

Proceedings reported by machine shorthand.  Transcript produced
by computer-aided transcription.

**P R O C E E D I N G S**

1

2    THE DEPUTY CLERK:  This is criminal case 06-334,

3  United States of America versus Haji Bagcho.  We have Matthew R.

4  Stiglitz and Marlon Cobar for the government, Shawn F. Moore and

5  Michelle Peterson for the defendant.  Naim Saidi is the

6  interpreter, and he has been sworn for the record.

7    THE COURT:  Good morning.  I am Judge Ellen Segal

8  Huvelle, and I've taken this case over from Judge Hogan, who is

9  now our administrative officer of the entire courts.  So I will

10  be trying the case on -- we're starting the 18th?  Am I correct?

11    MR. STIGLITZ:  Twenty-first, Your Honor.

12    THE COURT:  Twenty-first.  Okay.  Just a couple of

13  matters.  I understand from Judge Hogan a special jury has been

14  ordered.  I assume -- and I don't know this -- they put in for a

15  special order that.  Did anyone have any objection to the jury

16  office excusing people for hardships?  Was that a question before?

17    MR. COBAR:  No.

18    MR. MOORE:  No, Your Honor.

19    THE COURT:  As opposed to my having to do that.

20    MR. MOORE:  I don't think that really came up.  It was

21  certainly not an issue or anything.  I don't think we even knew

22  that the jury office was doing that, if they did it.

23    THE COURT:  No.  Well, they will if I tell them to.

24  It's just obvious hardship, somebody who's going to be out of

25  the country or who's having a medical procedure.  It isn't

1    anything that would be considered to be a close call.  And I

2    think they're calling in 60?

3              THE DEPUTY CLERK:  Sixty.

4              THE COURT:  Do you know anything else about that?

5              THE DEPUTY CLERK:  It's just 60 jurors, and they're

6    already doing the prescreening.

7              THE COURT:  They did, okay.  And Judge Hogan told me

8    he had two alternates.

9              MR. COBAR:  That's correct.

10             MR. MOORE:  That's correct.

11             THE COURT:  You now are predicting 11 days?

12   Mr. Stiglitz, is that sort of...

13             MR. STIGLITZ:  Good morning.

14             THE COURT:  Good morning.

15             MR. STIGLITZ:  Yes.  But just because we're -- for the

16   first trial the government's case took a couple days less than

17   that, but because we'll have full transcripts of prior

18   testimony, we're just anticipating perhaps some further

19   cross-examination, which may --

20             THE COURT:  Are your witnesses the same?  I wasn't

21   sure from your memo.  Or are you adding some?

22             MR. STIGLITZ:  There's a potential that we might add

23   two.

24             THE COURT:  And those would be?

25             MR. STIGLITZ:  Those would be two individuals from the

1    Federal Bureau of Investigation.

2              THE COURT:  Are they listed in your memo?

3              MR. STIGLITZ:  They are.

4              THE COURT:  What page is that, please?

5              MR. STIGLITZ:  That's going to be on page --

6              THE COURT:  Did you get a copy of this?

7              MS. PETERSON:  Yes, Your Honor.  We just received it.

8              THE COURT:  And which individuals?  "N"?

9              MR. STIGLITZ:  Diana Harrison and Hirotaka Nakasone,

10   "O" and "P."

11             THE COURT:  Oh, O and P.  Do you have any reports on

12   these -- these are experts, I assume.

13             MR. STIGLITZ:  Yes, but neither one of them will be

14   rendering an expert opinion concerning evidence in this trial.

15   The reason we haven't committed to calling them yet is that at

16   the last trial, as the Court probably gleaned from our memo,

17   there was some audio-recorded evidence of conversations that we

18   argue involved the defendant, and we also seized ledgers

19   belonging to the defendant.

20        At the last trial, in various parts of the trial, opening

21   and cross and in reference to closing, the defense made issue

22   with the fact that the government hadn't offered any sort of

23   expert testimony concerning voice identification or handwriting

24   comparison.  This is an attempt to address those assertions by

25   the defense.

1        THE COURT:  Well, but you just said expert testimony.

2        MR. STIGLITZ:  Yes.

3        THE COURT:  Are you saying you have not complied with

4   Rule 16(g)?

5        MR. STIGLITZ:  No, not at all.  Ms. Harrison will say

6   essentially that handwriting --

7        THE COURT:  I'm sorry.  I probably asked -- I asked a

8   leading question and I don't know what your answer is.  Have you

9   complied with Rule 16(g), federal rules about experts?  Have you

10  given them the necessary information called for by the rules?

11       MR. STIGLITZ:  Sure.  Well --

12       THE COURT:  Is that a yes?

13       MR. STIGLITZ:  Well, it's a partial yes, but let me

14  just explain a little bit more.  Ms. Harrison hasn't done any

15  sort of analysis.  She would testify essentially to the reason

16  we cannot do an analysis of the handwriting.

17       THE COURT:  Okay.

18       MR. STIGLITZ:  And similarly, Dr. Nakasone hasn't done

19  any analysis in this case.  He will also explain why there is no

20  scientifically reliable method of forensically testing for voice

21  comparison or voice identification.

22    Last week I spoke to Mr. Moore.  I did advise him that

23  these two witnesses -- I gave him a brief description of the

24  nature of what we would be calling them for, which is consistent

25  with what I just told the Court.  So Ms. Harrison I don't think

1    will ever be qualified as an expert per se.

2         Dr. Nakasone, maybe we'll be calling him as an expert

3    merely on the practice of the science, but not on a specific

4    test he conducted in this case.

5              THE COURT:  Did he conduct one here?

6              MR. STIGLITZ:  No.

7              THE COURT:  All right.  Any problems with either

8    of these two?  It's an effort to counter the *CSI* mentality of

9    jurors, I guess.  I don't disagree that it's really not a

10   Rule 16 problem.

11             MR. MOORE:  No.  I understand.  As I understand it,

12   the witness is being called solely to say that we couldn't do,

13   for example, a handwriting comparison, and we couldn't or we

14   don't do voice identification.  If that's it, then we don't have

15   any problem with that.  As long as they don't opine on

16   something, then I don't have any problem with that.

17             THE COURT:  My understanding is that they are being

18   called solely to explain why something has not been done or

19   cannot be done, not what has been done and what does it tell

20   you.  Correct?

21             MR. STIGLITZ:  Yes, Your Honor.

22             THE COURT:  Okay.  Well, you'll let us know anyways.

23        The other issues you brought up -- unless there's an

24   objection, I'm happy to sit five days.  It's four the first week

25   anyway, so Friday.  I'd prefer it if we can.  Is there anybody

1  with a problem?  I have very little conflicts.  I have one or

2  two things early in the morning that would take a little bit of

3  time.

4          MS. PETERSON:  Your Honor, I have a number of matters

5  that I think I can move around to accommodate the Court.  I had

6  mentioned to Judge Hogan that the afternoon of Tuesday, February

7  28, I have a conflict, if we could --

8          THE COURT:  What time?

9          MS. PETERSON:  I believe starting around 1:30.

10          THE COURT:  Okay.  Since Judge Hogan is such a softy

11  and already agreed, I have no choice, right?

12          MS. PETERSON:  It's the law of the case, Your Honor.

13          THE COURT:  Right, the law of the case.

14          MS. PETERSON:  But on Fridays, again, I have a few

15  matters, having thought that they would be open, but I think I

16  can get them all moved.

17          THE COURT:  Then on that day, Gwen, we won't have

18  breakfast; we'll just have -- well, I don't know about

19  breakfast, but they're not going to stay in the afternoon.

20  We'll excuse them at lunchtime.

21          MR. MOORE:  Your Honor, on Friday, March 2, I have a

22  sentencing, but it's at 12:30.

23          THE COURT:  It's in front of me.  I'll accommodate that.

24      (Laughter)

25          MR. MOORE:  Oh, that's right.

1              THE COURT:  No problem, Mr. Moore.  I won't let you

2    leave this trial.  Okay, that's fine.

3         I haven't yet obtained the transcript, but I understand it

4    will be available before we start.  I do have the preliminary

5    instructions, the final instructions, and I have the voir dire

6    that was used.  I know that the government has I think indicated

7    something about voir dire that they want to talk about here.

8    Have you had more thoughts?  Otherwise, unless anybody objects,

9    we'll use the same preliminary instructions.

10        Now let's hear about the voir dire.  If there are any

11   problems with the real instructions, I'd like to know about it

12   before the trial starts.

13             MR. STIGLITZ:  Instructions I don't think we have any

14   issues on.

15             THE COURT:  Preliminary and final?

16             MR. STIGLITZ:  There was one instruction that was

17   issued in the middle of jury deliberations in response to a

18   specific note.  We would ask that that be included in the

19   original instructions.

20             MS. PETERSON:  If it's appropriate in this case.

21   I don't -- I think it was because of something I said, and I

22   didn't disagree with the -- oh, I know.  It was voice

23   identification.  We had no objection to the instruction, had it

24   been given at the right time.  Our objection was to it being

25   given during deliberations.  So I have no objection to it being

1    added.

2                THE COURT:  If you want it added, if you could kindly

3    file it, because I don't know whether I have it.  I got the

4    instructions off ECF.

5                MS. PETERSON:  I'm going to have to review it to make

6    sure we didn't have any objections we would want to preserve for

7    the record this time on the instructions.  I don't recall that

8    we did.  I thought we resolved them all.

9                MR. STIGLITZ:  I think so.

10               THE COURT:  Okay.  I know there's a motion *in limine*.

11   The voir dire and arrest of somebody is not -- Mr. Gul, G-U-L,

12   that's not relevant.  We're not holding up the trial for

13   somebody who -- that's recently, I guess.

14               MR. STIGLITZ:  With respect to the voir dire,

15   Your Honor, I will tell you we haven't produced it yet because

16   we wanted to test the waters first, but Judge Hogan gave us

17   permission to speak to some of the jurors after the last trial.

18        There were a couple of revelations that came out in our

19   conversation with them that concerned us, because there were

20   issues that should have been raised by the jurors during the

21   voir dire in response to some of their questions.

22        So we were going to propose or going to ask the Court if it

23   would entertain the use of a jury questionnaire to facilitate

24   the voir dire process.  We haven't gone the route of producing

25   one yet; we wanted to wait to see what the Court's thoughts were

1    before we went that route.

2           MS. PETERSON:  Your Honor, we were there during the

3    discussion with the jury.  I can't think of a single thing the

4    jurors said that would have come out in voir dire.  They were

5    dissatisfied with the government's evidence.

6        I fundamentally don't have a problem with a questionnaire,

7    but I don't know that it's necessary in this case, and I don't

8    think anything in that conversation with the jury suggested that

9    one would have solved the government's problem.

10          THE COURT:  I don't, in theory, have a problem with a

11   questionnaire, and I've used them plenty of times.  The D.C.

12   Court of Appeals across the street just issued an opinion which

13   I've always thought was lurking out there, the issue, and it

14   concerns me because it says that the press can get the

15   questionnaires.

16       I believe I've probably told them in the past, and it may

17   be that we've told them in the cover sheet to these

18   questionnaires, your answers will remain confidential.  I think

19   that there's a substantial question now that that admonition

20   will not be upheld.

21       So, one, we would have to change the admonition, and it's

22   a bit of a double-edged sword.  It does slow you down a little

23   bit.  I'm perfectly happy for you to ask whatever questions.

24   I think we will do these people one by one, and so we would

25   bring them in as we go.  I haven't studied -- I have what you

1     used last time, but I haven't studied it.

2           You know, if you can agree to something and you really want

3     it and you really think it will help vis-a-vis the selection

4     process -- this is pretty lengthy voir dire.  I have 55 questions

5     here.

6           So if you want to address those in particular or you want a

7     questionnaire, it's okay, but I just now -- I don't know whether

8     this case will qualify, but one of the Abramoff-related cases,

9     the press really wanted to be in touch with the jurors and had

10    some decent law on their behalf.  I feel as though it's hard to

11    ask people to come and serve as jurors and then say your life

12    history becomes public information.

13          So I don't know.  It's just a concern I have.  It's hard

14    enough to get jurors to serve.

15                MS. PETERSON:  Your Honor, I have a related concern

16    that that reminded me of, both in terms of asking for a special

17    jury and if we were to use a questionnaire, and that is that

18    when jurors get that information, it's my understanding that

19    there's enough information on what goes out from the jury office

20    that any juror of above average intelligence can go on -- or even

21    average intelligence can go on and start reading about the case.

22          It's happened to me now twice in the last six months where

23    a juror has gone on and we've had to strike them from the voir

24    dire panel because they know something about the case when they

25    come in.

1        THE COURT:  Well, the questionnaire isn't sent to them

2   ahead of time.  They don't see it till they walk in.

3        MS. PETERSON:  Well, even what the jury office sends

4   to them to tell them they're part of a special jury is enough.

5   Twice now I've had -- in the Samoan case, someone had actually

6   gone on and read the pretrial motions to learn more about the

7   case.

8        THE COURT:  It's a problem with a city that's filled

9   with lawyers who have access, but I don't think the questionnaire

10  will -- that problem, if it exists, has happened already,

11  because I assume they send it out.

12       Well, you can talk to the other side and if you want

13  something, let us know and let me see it.  It has to be

14  closed-end questions.  I don't actually like the idea of asking

15  people to write small essays about their opinions on world

16  affairs, because some people just are not able to do that kind

17  of thing.  I would prefer to have yes-or-no questions, or do you

18  agree strongly, disagree kind of things, and then you can follow

19  up with the answers.

20       So I don't know how you feel about all that.  I haven't

21  spent any time looking at this.  We can discuss any modifications

22  to what we have here.  I don't know; it looks like you crossed a

23  few out.

24       Well, you consult with the other side, Mr. Stiglitz, and

25  figure out what you want to do, and then after that I think I'm

1   going to share with you Judge Hogan's notes so we can all be on

2   the same page, and I will have this typed up.  It looks like he

3   kind of moved things around a little bit, and I want to make

4   sure we're using the same numbers.  If you want any changes in

5   this, that'll be fine.  We'll have to do that before we start,

6   obviously.

7        I'm unaware, other than the coercion -- do you want to

8   respond to that briefly now, Ms. Peterson, or do you want to wait?

9            MS. PETERSON:  Your Honor, I didn't get it until this

10  morning because I've been in trial, so I think I'm going to have

11  to wait.  I just sort of looked at it briefly.

12           THE COURT:  Okay.  Let us assume that trial begins the

13  21st, which is a Tuesday.  Unless we decide something else,

14  we'll be bringing 60 people here, or not, Gwen?  I think we

15  ought not to bring them all in at once.

16           THE DEPUTY CLERK:  I don't know.

17           THE COURT:  Why don't we just divide them up 30 and

18  30.  How fast did you get through them?

19           MR. MOORE:  Your Honor, I think it was reasonably

20  efficient.  We had them all in, and I think we got through

21  reasonably efficient.  I think Judge Hogan excused a number of

22  them until the afternoon or something like that, but it worked

23  fairly well bringing them all in at the same time.

24           THE COURT:  You did?  You got through 60 in a day?

25           MR. STIGLITZ:  Well, what I think -- I agree with what

1  Mr. Moore is saying.  What I think makes sense for our

2  efficiency purposes is if we have the entire panel in at the

3  start, whether we do a questionnaire or an oral questioning by

4  the Court -- I'm assuming that the Court asks all the questions

5  and gives them a card to write their --

6          THE COURT:  Right.

7          MR. STIGLITZ:  So that might save time, just to do

8  that once.  Then, depending on what time it is, the Court can

9  say, all right, you know, you 30 come back either this afternoon

10  or tomorrow morning and we'll get to you then, and then start

11  the substantive at-the-bench questioning with the first 30 or

12  however -- that way you only have to ask everybody the questions

13  once.  That might be a little more efficient.

14          THE COURT:  Times have changed with the jury office,

15  is the problem.  Okay.  We'll figure it out.  Notify chambers a

16  week before whether we're going to use a questionnaire, because

17  if we're going to use a questionnaire, they do all come at the

18  same time and fill it out and then get sent home.  Sixty in a

19  day seems ambitious to me.  I mean, I know it is.

20          MR. MOORE:  Well, we're not going to get through 60 in

21  one day.  We didn't get through 60 in one day the first time,

22  but I think there are some efficiencies in having them all there

23  at least initially and asking some questions of all of them so

24  it doesn't have to be repeated.

25          THE COURT:  I understand.  Okay.  We'll figure that

1    out.  It doesn't take that long to ask the questions.  How many

2    did you have to get through to qualify -- 12, 2, 14, 24 -- 30

3    jurors?  I will try to qualify somewhere around 33.

4         MS. PETERSON:  Your Honor, I think, other than the

5    length of the trial, I don't recall there being that many that

6    were at issue.

7         THE COURT:  I wouldn't think so either.

8         MS. PETERSON:  And if the jury office is already

9    excusing ones who have really good reasons for that, I wouldn't

10   think it would be any more than the normal.

11        MR. MOORE:  We didn't have to supplement the initial

12   panel at all.  In other words, we still had a few left by the

13   time we made our selections.

14        THE COURT:  A few left out of 60?

15        MR. MOORE:  I mean we did not have to go through the

16   whole panel to qualify.

17        THE COURT:  Okay.  I agree.  We'll qualify about 33.

18   I don't know what Judge Hogan's practice is, but you exercise

19   your peremptories, one, two, until you even up.  Then we fill

20   the box with the juror alternate seats, unknown to the jurors.

21        After you do your peremptories, you can strike once per

22   side for the alternates.  Those people are replaced in the box,

23   the last two strikes.  Or if you both pass, that's it.  Then I

24   ask anybody if they have a problem that they haven't disclosed

25   to us, and often there is somebody.

1        So that's why I qualify slightly more.  And when you

2    exercise your strikes, look slightly beyond the 30.  But 30 is a

3    small number, really.  I haven't had a trial with only 30 in a

4    long time.

5        Okay.  Is there anything else, Mr. Moore, Ms. Peterson,

6    that I should know about that I probably don't know about it, or

7    any other issues you have?

8            MR. MOORE:  I don't think so, Your Honor.  Really,

9    I think the only new thing that we need to talk to Mr. Bagcho

10   about is to inform him that Mr. Gul, his son, was arrested.  But

11   that is not going to change the trial date at all.  I think this

12   is the first he's hearing of that.

13           THE COURT:  I'm sorry.  I shouldn't be the person to

14   inform people, but I believe it was in the public pleading.

15   I realize he doesn't read ECF.

16       Okay.  If there's anything you want to put on the record,

17   objections have already been ruled on, but for the jury

18   instructions, I suggest you do it in writing at some point to

19   protect the record.  I will use his preliminary instructions.

20   We've gone through the voir dire.  We start at 9:30, and we'll

21   sit, unless we hear otherwise, on Friday, except for that

22   Tuesday afternoon.

23       Anything for the government?  Do we have -- does this

24   schedule meet with the interpreter's schedule?

25           THE INTERPRETER:  Yes, Your Honor.

1        THE COURT:  Anything else for the government?

2        MR. STIGLITZ:  I don't believe so, Your Honor.

3        THE COURT:  Do you have a book of exhibits for me and

4   my law clerk?  And what do you do vis-a-vis the jury?

5        MR. STIGLITZ:  Sure.  What we did was -- let me tell

6   you what we did in the last trial and then ask you if that's

7   sufficient or if you want something additional.

8        We had a binder of all the documentary exhibits, of all the

9   original documents and also the CDs of the recordings.  That

10  went back to the jury for deliberations.  We also had a separate

11  binder for all of the transcripts of the various recordings that

12  we played at the trial.  Each juror had their own individual

13  binder of all the transcripts, and then there were several for

14  the court personnel and for defense counsel.

15       Then, of course, we prepared a exhibit list for the court

16  deputy to use as the basis of keeping track of which documents

17  were admitted and whatnot.  So I don't know if that's sufficient

18  for the Court, or does the Court actually want a duplicate

19  binder of all the exhibits for your own purpose?

20       THE COURT:  What are we talking about in volume?

21       MR. STIGLITZ:  It's about a three-inch binder.

22       THE COURT:  Sure.  You have one binder that's going to

23  go back to the jury and only one?

24       MR. STIGLITZ:  Correct.  We have a binder of the

25  actual original exhibits, or, if agreed upon, redacted copies,

1     things of that nature.  They're in plastic sleeves, so during

2     the trial, when we're discussing them with witnesses or using

3     them on the ELMO, we take them out of the binder.  They're each

4     individually labeled.  Rather than just having a box of loose

5     exhibits, we thought it was better to have them all in one

6     binder, but we didn't have a separate duplicate binder for the

7     Court.

8              THE COURT:  I usually make you have a binder for every

9     juror, but it doesn't sound like there are very many here, and

10    most of it's the transcripts.  But yes, I would like to have a

11    copy of the exhibits.

12             MR. STIGLITZ:  Then you shall have one.

13             THE COURT:  And an exhibit list.

14        You had no witnesses?

15             MS. PETERSON:  That's right.

16             MR. STIGLITZ:  Also, for the court reporter we put

17    together a list of terms that you're probably going to want to

18    put into your database ahead of time.

19             THE COURT:  He, unfortunately, is not our court

20    reporter.  I'd like to make him my court reporter.  How about

21    that?

22        That would be very helpful.  Judge Hogan told me he had

23    suggested, and I assume that you will take to heart the idea of

24    a picture book of witnesses with names.  It is hard.

25             MR. STIGLITZ:  We'll probably do something much more

abbreviated for the jury that we did for the Court with respect

to the various players, a very basic, non -- I'm already seeing

Michelle's game face.  So obviously she's going to have --

        THE COURT:  We have to try to call everybody by

Ms. Peterson and Mr. --

        MR. STIGLITZ:  I'm sorry.  I meant Ms. Peterson.

        MS. PETERSON:  Your Honor, I can't imagine a scenario

that we will not object to anything going to the jury that is

not in evidence.  I mean, you can't have a demonstrative exhibit

that gives evidence that's not been testified to.

        THE COURT:  Well, he can certainly have a picture book

with people's names on it, and that's demonstrative either way.

I don't know.  Obviously, you're not going to have descriptions

of this drug buy 2.

        MR. STIGLITZ:  No.

        THE COURT:  No.  He's not.  Can't be that stupid.

    All right.  Is there anything, Ms. Peterson, before you sit

down -- I haven't spent a whole lot of time going through what

happened in the past.  I will get the transcript.

    The government took it upon themselves to give me a trial

memorandum, which is helpful in terms of who's who and what's

their claims, and I don't know if there's anything you want to

direct our attention to to get up to speed.

        MS. PETERSON:  Your Honor, there was a recurring

problem in the government's case in that their witnesses can't

1  tell time, and I don't mean that in a pejorative sense.  I mean

2  in the sense that they don't know what year anything happened.

3  We had a continuing objection that I'm sure we will have again

4  where they cannot --

5          THE COURT:  Lead.

6          MS. PETERSON:  Right.  The government cannot lead them

7  to establish their conspiracy dates.  I don't know that we'll

8  file anything when the Court gets the transcripts and we get the

9  transcripts and review that, and perhaps we'll file something to

10 alert the Court to those continuing objections that we had

11 throughout the trial.

12         THE COURT:  Okay.  When I hear it, I hear it, but

13 she's putting us on fair notice that she doesn't want you to

14 start your question "focus on May 2000-whatever."  All right.

15     Well, I'm happy to be getting an interesting case to try,

16 and we look forward to it.  Please let us know at least a week

17 ahead of time what your intent is.  If you can come up with a

18 questionnaire -- perhaps we ought to just have one more status

19 shortly before so we'd know.  It'll be very short.

20     I know that I have -- so you're here, Mr. Moore, on the

21 16th at 9:30.  Could we have a short status?  Is the interpreter

22 available on the 16th of February for a half hour at most?

23         THE INTERPRETER:  Yes, Your Honor.  I can come from

24 New York.

25         THE COURT:  Well, the other option, Ms. Peterson -- it

1    seems kind of unnecessary for what we're looking at -- is that

2    if we waive his presence we can just discuss by phone whether or

3    not we're having a questionnaire, and if so, file it with me

4    ahead of time.  I'll follow it up with a call if we need it.

5    If we don't need it, then I will have my law clerk communicate

6    Judge Hogan's current set of questions just so I can clean it up

7    a little bit.

8            MS. PETERSON:  Your Honor, could we have just one

9    moment with our client and the interpreter?

10           THE COURT:  Right.  I don't think we'll actually have

11   a substantive discussion.  You're going to file a week in

12   advance a questionnaire, if you've got one, with small

13   objections.  Otherwise, it's agreed to.

14       If that doesn't happen, I will communicate with you by

15   e-mail Judge Hogan's prior questionnaire, and then you can just

16   get together and clean it up so we all have the right numbers.

17   You can do that jointly.  I don't expect that we'll really need

18   to figure this out, but go ahead.  I understand.

19       (Counsel confering with defendant with the aid of the

20   interpreter.)

21           MS. PETERSON:  Your Honor, Mr. Bagcho does not have

22   any objections to not being present for any conversations about

23   how we're going to handle the jury voir dire process.

24           THE COURT:  All right.  I would ask that by the 9th

25   that, if a questionnaire is going to be used, that you file

1    whatever's been agreed to and whatever's disagreed to, and I can

2    figure it out from there and be back in touch.

3         If you do not want to go that route, or alternatively can't

4    come up with anything that's agreeable to both of you, then

5    we'll give you a scanned copy of Judge Hogan's, what I have to

6    work with, and we'll clean that up after you've taken a look at

7    it.  So we will not have a second status.  We'll just start on

8    the day.

9         We've decided to call in -- I think we'll probably handle

10   48 or 50 in the first day.  Have them come in, send away half of

11   them for the afternoon.  I think we can probably do it.  If I'm

12   wrong, some people will be carried over, and if I need more,

13   I'll bring in the next 10 the next day.

14        This is to satisfy some new mandates regarding use of

15   jurors and costs associated with bringing people in.  I think

16   it'll work just fine if we bring in, say, 48 or 50.  They're

17   prescreened, and we can get through 25 in the morning and 25 in

18   the afternoon.  If we need the other 10, they'll be on call.

19        All right.  Thank you very much.  We'll be back on the 21st.

20        (Proceedings adjourned at 11:02 a.m.)

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE